[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
By Revised Amended Petition dated December 9, 1996, the petitioner claims that his incarceration in the custody of the respondent is unlawful on the basis of his assertion that he was denied the effective assistance of counsel in his underlying criminal proceedings. Based on the evidence adduced at the habeas hearing, the court makes the following findings and order.
On November 7, 1989, following a jury trial in the Superior Court, Hartford Judicial District at Hartford, the petitioner was found guilty of the offenses of Interfering with a Search Warrant in violation of Connecticut General Statutes § 53a-33d, Unlawful Restraint in the First Degree in violation of C.G.S. § 53a-95, Risk of Injury to a Minor in violation of C.G.S. § 53-21, Reckless Endangerment in the First Degree in violation of C.G.S. § 53a-63, and Criminal Use of a Firearm in the Commission of an Unclassified Felony in violation of C.G.S. § 53a-216. Following the jury's verdict, and upon motion of defense counsel, the court acquitted the petitioner of Unlawful Restraint in the First Degree on the basis that the evidence was insufficient to sustain the verdict and the charge of Criminal use of a Firearm in the Commission of an Unclassified Felony on the basis of the statutory language that,
 "No person shall be convicted of criminal use of a firearm or electronic defense weapon and the underlying felony upon the same transaction but such person may be charged and prosecuted for both such offenses upon the same information." C.G.S. § 53a-216.
On December 12, 1989, the petitioner was sentenced to a total CT Page 11834 effective sentence of twenty years confinement. He is presently an inmate in the custody of the respondent Commissioner.
The petitioner's conviction was affirmed on direct appeal.State v. Jenkins, 24 Conn. App. 330 (1991), cert. den'd,219 Conn. 903 (1991).
In the underlying criminal trial, the petitioner was represented by Attorney William Gerace. The State was represented by Assistant State's Attorney Christopher Morano. On appeal, the petitioner was represented by Attorney Brian M. O'Connell.
The petitioner claims that trial counsel failed to interview and to subpoena certain individuals to testify at his trial, and that he failed to object to improper comments made by the Assistant State's Attorney in closing argument. He claims that appellate counsel failed to raise the issue of prosecutorial misconduct in his appellate brief.
The petitioner's trial commenced on October 23, 1989, and concluded on November 7, 1989. A review of the transcript reveals that fourteen individuals testified for the State. While the defendant did not testify, several witnesses were called by the defense, including three who had been arrested with the petitioner, but whose cases had been completed by the time of his trial.
While the underlying facts are outlined in the Appellate Court decision, some discussion of the evidence is a necessary predicate to the court's assessment of the petitioner's claims.
The State offered evidence that on July 28, 1988, at approximately 10 p. m., twelve officers of the Hartford Police Department arrived at the Stowe Village housing project in Hartford where they had a valid search and seizure warrant for apartment 204, 105 Hampton Street. Sgt. Frank Campbell testified that as two officers proceeded to the apartment building, they noted a group of African-American males congregated in front of the building, and as the officers approached the building, the group moved inside the building, and then into apartment 204. Campbell testified that apartment 204 had two outside doors, both metal, with one opening into the kitchen and the other into the living room. When the officers first knocked at the door, one of them informed the occupants that they were looking for a little girl who was lost. Campbell testified that this ruse was utilized CT Page 11835 in the hope that the occupants would not take the time to destroy and otherwise get rid of narcotics they suspected were within the apartment. Campbell testified that when their story about a little girl was met with abusive language, the officers announced that they had a search warrant and demanded entry. Campbell stated that, confronted with more obscene language and threats, the officers called for backup as well as sledge hammers with which they intended to break down the apartment's two metal doors. During this time, Campbell testified, the officers at the front doors heard individuals running inside the apartment.
Campbell testified that Detective Robella broke down and opened the doorway into the living room while Detective Getz, who was attempting to open the kitchen door, broke its lock. Campbell stated that when the living room door opened, he could see a man carrying a young child approximately two years old, and holding a pistol in his right hand. This man was at the end of a hallway. At trial, Campbell identified this person as the petitioner, whom he stated he had known for approximately three years. Seeing a man holding a child and a pistol, Campbell testified, he ordered his men to back away from the apartment. He stated that approximately five to six minutes after he ordered the women and children to leave the apartment, two women and one child, approximately twelve years old, came out. Campbell continued that approximately twenty to thirty minutes later, some of the men inside the apartment yelled that they were coming out. They were directed to crawl out of the apartment one at a time. Six men left the apartment in this manner. Campbell stated that as the six males were leaving the apartment, the petitioner yelled from inside the apartment that he I did not want them to leave, and that they would pay for leaving. At this juncture, Campbell stated, there were two males, including the petitioner, and one child remaining in the apartment.
Campbell stated that while these events were happening inside the apartment and police were in force in the hallway outside the unit, a crowd was gathering outside the apartment building.
Campbell testified that after most of the males had left the unit, Attorney Wesley Spears arrived upon the scene, indicating that the petitioner had called him from the apartment, and he asked if he could speak with him. Campbell stated that Attorney Spears spoke with the occupants through the metal door. Soon thereafter, Campbell stated, one male exited, followed by the young child, and then the petitioner. Once the apartment was CT Page 11836 cleared, Campbell testified, the police executed the search and seizure warrant. Campbell claimed that approximately two hours passed from the time the police arrived at the housing complex until the apartment was cleared of its occupants.
On cross examination, Campbell acknowledged that in his written report of the incident, he did not name the petitioner as the person who had made threatening remarks to the officer when they announced themselves and their purpose. He also acknowledged that he had not seen any male holding the child in his arms with a pistol in his hand at the apartment's back window even though this incident was noted in his report. He acknowledged, also, that he had only seen the petitioner for a few seconds at the end of a hallway once the living room door had been broken down, and that he saw the petitioner from behind two officers who were in the entryway. He denied, however, that his view was impaired. He also acknowledged that one of the females who had exited the apartment first was the young child's mother, and the mother had not objected to the child remaining in the apartment with the petitioner.
On redirect examination, Campbell testified that while he did not see the petitioner standing at an apartment window holding the child as well as a pistol, other officers had reported this information to him. Additionally, he stated that other officers had told him that a male had thrown the pistol out the window.
Following Campbell was Officer Ronald Duke who testified that when he arrived at the housing project, he noted that a couple of African-American males, who had been standing outside, entered the building as the police neared. Duke indicated that once the police knocked at the apartment door and stated that they were looking for a missing little girl, one of the apartment's occupants stated, "F___ You, Duke", and once the officers stated that they had a search warrant, the petitioner yelled that they would start shooting if the officers tried to gain entry. Duke testified that when the two females and children started to leave the apartment, the petitioner picked up the younger child and took her back into the apartment.
On cross examination, Duke acknowledged that in his written incident report, he did not note that the police used the ruse that they were looking for a lost child when they first knocked at the apartment door. When asked why he did not mention this in his report, he stated that he forgot this part of the CT Page 11837 occurrence.[1] Duke also admitted that he had not seen the petitioner with a gun or at the back window of the apartment.
Det. Peter Getz testified that he saw the petitioner holding a child with a revolver in his hand at the end of the hallway once the living room door had been opened. He also stated that he saw the petitioner holding a baby in his arms at a back window. On cross examination, however, Getz acknowledged that his report makes no note of the petitioner by name, and he acknowledged that he did not actually see the petitioner holding a baby at the window.
Officer Paul Kutcher testified that he arrived at Stowe Village at approximately 10 p. m., and he claimed that, from a vantage point outside the apartment building looking in through a window, he saw a group of males inside the apartment throwing objects. He stated that he assumed they were dumping materials down a kitchen sink. He testified that he saw the petitioner standing at a window holding an infant in his arms. He stated that the petitioner was shouting to the crowd forming below the window, stating, "You want this baby to die? Go ahead and f_____g shoot, the baby will get it too." Petitioner's Exhibit 1, Trial Transcript 635. Kutcher testified that at one point, the petitioner threw a pistol out of the window. He indicated that he retrieved the weapon, a loaded .357 magnum.
Officer Patrick Sullivan testified that during the search of the apartment he found a Smith and Wesson .38 caliber handgun in a closet together with some loose rounds of ammunition. On cross examination, Sullivan acknowledged that he had no indication that the petitioner, who did not live at the apartment, knew that the weapon was there.
During the search of the apartment, officers found and seized a gram scale, vial caps and containers, in addition to the .38 weapon. While they detected white powder in the sink and a toilet bowl, Campbell stated that they forgot to take samples for testing. They did take some powder which proved, on analysis, to be flour. The gram scale contained cocaine residue. None of the apartment occupants was arrested for possession or sale of drugs, or drug paraphernalia.
The State called Victoria Perry, one of the females who had been in the apartment, and the mother of the young child. Perry, who was granted immunity from prosecution, testified to the CT Page 11838 child's date of birth, and acknowledged that she lived in the subject apartment. She stated that she was a friend of the petitioner's. Perry testified that as she was leaving the apartment, her daughter ran back into the apartment. She stated that she was not concerned that the child was inside the apartment with the petitioner. She was not afraid that the child would be hurt by anyone inside the apartment. She was concerned, she stated, about the police officers. On cross examination, Perry testified that she had consented to her child being with the petitioner, and that the child had turned back to the petitioner out of fear of the police. She also stated that the petitioner had asked the police if she and the baby could come out first, and that some of the adult males had picked up the children to bring them out, but the police had told them to put the children down. Perry stated that when the police first came to the apartment, they said that they were looking for a missing little white girl. She also said that the petitioner was not in possession of a gun at any time she was in the apartment, and she did not hear the petitioner make any threats.
Det. Linworth Jones testified that once at the police station, the petitioner called to two of the males who had left the unit, "You people are a bunch of c__ts. You're supposed to be my lieutenants. We could have went (sic) out in a blaze." Petitioner's Exhibit 1, Trial Transcript, 1045.
Detective Michael Manzi testified as an expert on drug trafficking that the behaviors of the individuals inside the apartment when confronted with the police presence, coupled with the discovery of vials, containers, and a gram scale, were indicative of illicit commercial drug activities within the apartment.
Manzi's testimony, as well as testimony concerning the paraphernalia seized, was introduced not as evidence of the petitioner's drug culpability, but rather to demonstrate motive to delay and interfere with execution of the search warrant.
Once the State rested, the defense moved for acquittal on all counts. While the court expressed concern regarding the Unlawful Restraint charge, the motion was denied.
The defense called Thomas Ealy, one of the apartment. occupants, who testified that Leon Perry, another occupant, had been in possession of a .357 magnum pistol. Ealy also stated that CT Page 11839 Perry threw this weapon out a window as soon as the police started banging on the apartment door. Ealy stated that the petitioner never had possession of a gun during the occurrence. With respect to charges against him arising out of this incident, Ealy stated that he had been charged with interfering with a search warrant and destruction of evidence.
Attorney Wesley Spears testified at the criminal trial that the petitioner called him between 10:30 p. m and 10:45 p. m. He stated that once he got to the apartment he tried to speak with the petitioner through the metal door, but because of the thickness of the door he could not adequately converse with the petitioner.[2] Attorney Spears indicated that when he spoke with the petitioner he told him that he thought his presence substantially reduced the chances that he would be beaten by the police. At this juncture, Attorney Spears stated, there were approximately twenty police officers in the hallway outside the unit, all with guns drawn. After leaving the door, Attorney Spears went outside and to the rear of the building where he spoke further with the petitioner. At this point, Attorney Spears stated, the petitioner was standing at a window, and a young child was holding on to him. Attorney Spears stated that he told the petitioner he could come out of the apartment. Attorney Spears testified that he then returned to the apartment door. He indicated that he was apprehensive for his own safety, and that another of the apartment's occupants had been beaten by the police. Attorney Spears stated that he opened the apartment door and saw the child in the petitioner's arms. He stated that he tried to take the child from the petitioner but she resisted. Ultimately, he stated, he yanked the child from the petitioner, and then he coaxed the remaining males out of the apartment.
On cross examination, Attorney Morano elicited testimony from Attorney Spears that he had represented the petitioner for approximately three years prior to the incident, that the petitioner had referred other clients to him, and that the petitioner had paid fees to him. With respect to his comments about a beating, he stated his belief that the police had used excessive force, that he had seen a man at the police station whose two front teeth had been knocked out by the police.[3]
Attorney Spears confirmed that the child had been holding on tightly to the petitioner.
Charles Moreland testified that he had been present in the apartment and that the police had knocked two of his teeth out as CT Page 11840 he crawled from the apartment. He stated that his teeth had been knocked out with a foot and a night stick as he was lying on his stomach. He stated that he had been in the back room of the apartment, and that Edgar Perry had been holding a pistol. He testified that Perry threw the pistol out the window. He acknowledged that he had a prior felony record consisting of convictions for robbery and narcotics possession. With respect to charges arising out of this incident, Moreland testified that his case was finished.
Leon Perry, who was incarcerated on unrelated charges at the time of the petitioner's trial, and who declined the opportunity to converse with counsel prior to testifying, stated that he had been in the apartment on the evening in question and that he had been in possession of a .357 magnum. He claimed that the petitioner had not been in possession of any weapon, and he stated that he tossed the pistol out the window immediately after the apartment door was broken down. He also stated that he saw no other weapons in the apartment, and he did not see the petitioner holding a child with a pistol in his hand. He stated that he was charged with destroying evidence and interfering with a search warrant.
On cross examination, Perry acknowledged that he had a prior felony record consisting of Robbery in the Third Degree, Carrying a Dangerous Weapon, and Failure to Appear in the First Degree.
The defendant's final witness was Private Detective Donald Gates who testified, from recent physical observation, that the rear window of apartment 204 swung open, and was approximately fourteen inches wide, and thirty-four and one-half inches tall. Gates stated that the window had a metal rim, making it approximately twelve inches wide when opened.
From the court's review of the evidence, the court concludes that the credibility of witnesses was a pivotal issue in the petitioner's underlying criminal trial. With respect to several of the police officers, defense counsel pointed out that their reports did not mention the petitioner by name even though the officers who prepared the reports claimed at trial to have known the petitioner at the time of the occurrence. Through cross examination, defense counsel attempted to demonstrate the contrast between the absence of the petitioner's name in the officers' reports and their certainty at trial that the petitioner had been the one to threaten the police, that the CT Page 11841 petitioner had possession of a weapon, and that the petitioner held a young child and a pistol while standing at a rear window and making threatening statements.[4]
In order for the petitioner to succeed in his claim that he was denied the effective assistance of counsel in the criminal proceedings, he has the burden of proving both that his trial counsel's performance was deficient and that he was actually prejudiced by his counsel's deficient performance. Strickland v.Washington, 466 U.S. 668 (1984), Bunkley v. Commissioner,222 Conn. 444 (1992), Copas v. Commissioner, 234 Conn. 139 (1995).
The petitioner s right to the effective assistance of counsel is assured by the sixth and fourteenth amendments to the Federal constitution and by Article First, Section 8 of the Connecticut constitution. In order to prove that his counsel's performance was deficient, the petitioner must demonstrate that trial counsel's representation fell below an objective standard of reasonableness. Aillon v. Meachum, 211 Conn. 352 (1989). Competent representation is not to be equated with perfection. "The constitution guarantees only a fair trial and a competent attorney; it does not ensure that every conceivable constitutional claim will be recognized and raised." Jeffrey v.Commissioner, 36 Conn. App. 216 (1994) (citations omitted). "Defense counsel's performance must be reasonably competent or within the range of competence displayed by lawyers with ordinary training and skill in the criminal law." (Citations omitted; internal quotations marks omitted.) Johnson v. Commissioner,36 Conn. App. 695 (1995).
The Strickland court also gave guidance to the trial bench for its assessment of ineffective claims. The Supreme Court opined: "Judicial scrutiny of counsel's performance must be highly deferential. It is all too tempting for a defendant to second guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable . . . A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the, conduct from counsel's perspective at the time. Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable CT Page 11842 professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action `might be considered sound trial strategy' . . . [C]ounsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." (Citations omitted.) Strickland v.Washington, supra, 466 U.S. 689-90; Quintana v. Warden,220 Conn. 1 (1991); Williams v. Warden, 217 Conn. 419 (1991); Jeffrey v.Commissioner, 36 Conn. App. 216 (1994).
With respect to the prejudice component of the Strickland
test, the petitioner must demonstrate that, ". . . counsel's errors, were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." Strickland v.Washington, supra, 466 U.S. 687. Thus, "An error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the judgment." Id., 691. "It is not enough for the [petitioner] to show that the errors had some conceivable effect on the outcome of the proceedings." Id., 693. Rather, a successful petitioner must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. Copas v.Commissioner, 234 Conn. 139 (1995). "A reasonable probability is a probability sufficient to undermine confidence in the outcome."Strickland v. Washington, supra, 466; U.S. 694. "`When a [petitioner] challenges a conviction, the question is whether there is a reasonable probability that, absent the errors, the fact finder would have had a reasonable doubt; respecting guilt.'" Fair v. Warden, 211 Conn. 398, 408 (1989); Jeffrey v.Commissioner, 36 Conn. App. 216 (1994).
The only evidence the petitioner presented at the habeas hearing in support of his claim concerning trial counsel's alleged failure to interview and subpoena certain witnesses who would have offered exculpatory evidence at trial related to Lee Hardy, who was present with him in the apartment. At the habeas hearing, the petitioner testified that there had been eight men, two women, and two children in the apartment when the police arrived. He stated that after several of the men, the two women, and one child left the apartment, he remained in the apartment with Hardy, Jonathan King, and a two year old child. He denied that he made any of the threatening comments attributed to him by police witnesses at his criminal trial. Additionally, he denied holding the child at a window, and he denied ever being in CT Page 11843 possession of a gun during the incident. He stated that he informed Attorney Gerace about the presence of Hardy, and that he asked Attorney Gerace to call Hardy as a witness because he had been in a position to observe his behavior at all times during the incident. He also indicated that he had told Gerace that he had seen Hardy with the small child, and that he had seen Hardy go to a window with the child to call to his mother.
Hardy testified at the habeas hearing that he had been in the apartment during the incident. He stated that after most of the men, the women, and one child left the apartment, he remained with the petitioner, King, and the small child. He stated that when he first noticed the child she was standing in the hallway across from the bathroom. He claimed that he never saw the petitioner go into the hallway and grab the child to take her back into the apartment, and he said that he did not see the petitioner hold the child by any window. Hardy confirmed that he had held the child against the window for a minute while he was talking with his mother. He also stated that he never saw the petitioner with a gun during the incident and he did not recall the petitioner using abusive language toward the police. He denied that he had ever been in possession of a gun during the occurrence. Hardy stated that he was arrested as a result of the incident, pleaded guilty to Breach of Peace and was sentenced to ninety days confinement. By the time of the petitioner's trial, he stated, he had completed his sentence. He stated that though he was not contacted by Attorney Gerace, he was available and would have testified upon request.
Attorney Gerace testified that he has no specific recollection of Hardy. Additionally, he commented that since his file in this matter has been shredded, he has had no opportunity to refresh his recollection with notes. He has no memory of what the petitioner may have told him prior to the commencement of trial. With respect to Hardy, he stated that if Hardy had been a fact witness he would have considered calling him to testify, but that if he had been represented by counsel he would have asked counsel for permission to talk with Hardy. He stated that this was his routine practice. Attorney Gerace did recall speaking with several witnesses prior to trial, and he recalled making a decision to call some individuals and not others.
The court finds that Hardy's testimony would have been exculpatory to the petitioner. While the court is unable to determine the reasons Hardy was not called to testify, and the CT Page 11844 court credits Attorney Gerace s testimony that he spoke with more individuals than he called, the respondent did not rebut the petitioner's testimony that he told counsel about Hardy; nor did the respondent contest Hardy's testimony that he was available and willing to testify, and that he was never contacted on the petitioner's behalf in conjunction with this trial. The fact that the charges against Hardy arising out of this incident had been disposed of prior to the commencement of the petitioner's trial makes it less likely that Hardy's counsel, if he had one, interposed any objections to his testifying. Additionally, the respondent did not adduce any probative testimony from or about Hardy at the habeas hearing to demonstrate that his credibility would have been vulnerable on cross examination.
Though it may be a close question whether it was ineffective for counsel not to have called Hardy as a trial witness, or at least to have interviewed him prior to trial, the petitioner's claim regarding Hardy can be resolved on the basis that counsel's failures, if any, regarding Hardy, did not prejudice the petitioner.
The petitioner has failed to demonstrate that, but for counsel's failure to call Hardy, there is a reasonable likelihood that the outcome of the trial would have been different. In many respects, Hardy's testimony would have been cumulative to that of Ealy, Moreland, and Perry, who were called as defense witnesses. Ealy, Moreland, and Perry all testified that Perry had the .357 magnum pistol, and that Perry threw it out the window. Ealy and Perry stated that the petitioner never had a gun in his hand. Hardy's testimony would have added that he, and not the petitioner, had held the child while at the window. His testimony, however, that he never saw the petitioner at the window with the child would have been inconsistent with the trial testimony of another defense witness, Attorney Spears, who stated that when he spoke with the petitioner while the petitioner was at the rear window, he saw the child holding onto the petitioner. (Cf. Petitioner's Exhibit 1, Trial Transcript 1232.) The petitioner has failed to demonstrate prejudice in counsel's failure to call Hardy as a witness.
Count Two of the Revised Amended Petition concerns counsel's failure to object to certain improper comments made by the Assistant State's Attorney in closing argument, failure to seek a curative instruction, and failure to move for a mistrial as a result of the improper comments. CT Page 11845
During the trial, the petitioner exercised his right not to testify. In closing argument, however, Attorney Morano commented that the petitioner had a prior felony record. While it appears from a reading of the transcript that Attorney Morano was, in fact, referring to Perry, and his mention of the petitioner's name was an inadvertence, the statement was nevertheless made. Attorney Morano stated the following:
 "Edgar Leon Perry was an interesting witness. A very interesting witness. He was very cool, calm and calculated. But again, he was arrested the same night. He knew Mr. Jenkins the longest period of time, ten to fifteen years. They're very close friends. Again, saw each other almost every day. He claims that he and Mr. Jenkins never discussed this case even prior to his incarceration. Again, I find that hard to believe'. Two people arrested in a bizarre situation such as this would never discuss it after the incident occurred.
 Interesting point here, you may recall that when he was testifying as to the time he threw the gun out, he mentioned — and corrected me — after the second knock. Now, for someone who's never discussed the case with anyone for a year and never had anyone tell him anything about the case, I find it rather interesting that he would recall the significance of the knocks here. Maybe I'm making too big a thing out of something but I found that to be rather intricate and rather interesting point that may reflect upon his credibility regarding his statements of never discussing this either prior to his incarceration or since his incarceration.
 You have to examine his testimony, again, in the area of bias and credibility. Certainly, he has a bias in favor of Mr. Jenkins and this is displayed by his testimony. Credibility Again Mr. Jenkins has felony convictions. Robbery in the third degree, failure to appear in the first degree. This can be used against his credibility.
 In addition, while we have discussed his bias for the defendant, there's also the area of his CT Page 11846 bias against the State due to his pending cases. There are arrests by the Hartford Police Department. They're being prosecuted by the State's Attorney's office. My office. They may be used to show his bias against the State.
 In short, Mr. Perry appears to be a very loyal friend to Mr. Jenkins but don't let the appearance of this loyalty create an appearance of being honorable. Don't let it overshadow the fact that this witness, as well as the others, are playing the old-fashioned shell game but instead of a little nut under the shell, they're trying to hide criminal liability." (Underlining added) Petitioner's Exhibit 1, Trial Transcript, pp. 1456-1457.[5]
At the habeas hearing, Attorney Gerace testified that he had no recollection of this reference to the petitioner. He also stated his belief, based on a review of the transcript, that the comment was obviously directed at Perry, and the mention of the petitioner was clearly an inadvertence. That may well be so. However, the court is unwilling to assume that all of the jurors, who had just heard a two week trial with numerous witnesses, were aware that Attorney was referring to Perry and not to the petitioner. At the moment of hearing this statement, the jury did not have the same benefit of quiet reflection, and they did not have transcript pages before them. They had just heard from several witnesses whose friendly relationships with the petitioner were brought home to the jury on cross examination, and they had heard that Ealy had been charged in the incident, and that both Moreland and Perry had felony records involving robbery.
At the habeas hearing, the petitioner called Attorney Louis Avitabile to testify as an expert witness on the issue of effectiveness. Attorney Avitabile is an experienced criminal defense attorney who has been in practice since 1968. He has tried approximately ninety-two criminal trials to conclusion and handled approximately sixty appeals. Attorney Avitabile stated that counsel should have objected to the comment made by Attorney Morano in closing argument that the petitioner had a criminal record. While agreeing that, in light of the fact that the petitioner did not testify, the prosecutor was obviously making a mistake in stating that the petitioner had a criminal record, CT Page 11847 Attorney Avitabile asserted that a criminal defense lawyer of ordinary skill and training should have objected to the comment because it was improper. He also offered his opinion that the comment may have led the jury to understand that Attorney Morano was implying that Jenkins, who was Perry's close associate, had the same criminal record as Perry. While the court views Attorney Avitabile's supposition as more speculation than analysis, the court is persuaded that there was no valid reason, based on tactics or strategy, for defense counsel to have remained mute when the comment was made.
In general, evidence that a criminal defendant has been convicted of crimes on prior occasions is not admissible. Statev. Geyer, 194 Conn. 1 (1984); State v. Amaral, 179 Conn. 239
(1979). The statement, therefore, that the petitioner had a prior felony record, even if made inadvertently, was improper and violated the petitioner's rights.[6]
Attorney Gerace testified that he has no specific recollection of this statement by Attorney Morano. He reasoned that since Jenkins did not testify there would have been no reason to have referred to him. While not having a specific recollection of the incident, Attorney Gerace testified that as a general proposition counsel should never object during final argument because jurors view interruptions as rude and upsetting. He stated that if he had objected he would have brought an inappropriate focus to the petitioner at that time. Since he did not, however, recall the actual incident, he was not able to state whether, at the time the comment was made, he assumed that the jury knew it was a mistake.
While generally the court will defer to the tactics of counsel and to decisions made at the time of events, the court's deference is not unbounded. In order to conclude that counsel's silence was the product of sound trial strategy, the court must first determine that counsel actually heard the comment and consciously chose to ignore it rather than to cause focus on the issue. This the court will not do. While the court recognizes that a substantial period of time has passed since the petitioner's trial, the assertion by Attorney Morano that the petitioner had a criminal record would, in the view of this court, have been a memorable slip if it had been detected by counsel in the first place. Additionally, the court agrees with Attorney Avitabile's assertion that there was no reason based on sound trial tactics or strategy not to have objected to the CT Page 11848 statement and not to have asked the court for an immediate curative instruction to the effect that there was no evidence before the jury that the petitioner had any criminal record.[7]
Certainly the instruction would have been warranted, and, more than likely would have been given upon request.
In his closing argument, in addition to an improper, though mistaken, reference to a past criminal record, the Assistant State's Attorney made personal comments concerning the evidence and witnesses which were testimonial in nature. He also made an extra-evidentiary statement concerning the function of the State's, Attorney's office in prosecuting claims of excessive police force.
Atty Morano expressed his personal opinion with respect to the credibility of four of the five defense witnesses.
Referring to defense witness Ealy, Attorney Morano stated,
 "Again, regarding his recollection of the facts, I'll just briefly go over it. I submit to you his credibility was minimal." Petitioner's Exhibit 1, Trial Transcript 1453. (Underlining added)
Referring to defense witness Moreland, Attorney Morano stated,
 "He stated although he was arrested with Mr. Jenkins and saw him almost on a daily basis, they never discussed the case until a week ago. I find that hard to believe." Underlining added.)
Concerning defense witness Perry, Attorney Morano stated:
 "He claims that he and Mr. Jenkins never discussed this case even prior to his incarceration. Again, I find that hard to believe." Id. 1457. (Underlining added)
With respect to Attorney Wesley Spears, Attorney Morano commented,
 "Mr. Spears. Not much I can say about Mr. Spears. I want to preface my remarks by saying I CT Page 11849 don't feel that he was trying to tell untruths on the stand. I don't think he would do that. I'm thankful that he was at the scene to assist in ending it. However, I do think his relation to Mr. Jenkins would motivate him to try to portray Mr. Jenkins in the best possible light. Why? He's his attorney. Secondly, Mr. Jenkins has referred him clients. Third, he's an attorney, he's looking out for the best interests of his client. While he's not his attorney in this particular case, he's still his attorney and has been and was at that time." Id. 1455.[8]
Attorney Morano was not alone in his characterization of witness credibility. Following the opening of the State's summation and all of the comments noted supra, Attorney Gerace commented, "Edgar Leon Perry came out of that lockup and if hewasn't telling the truth. I don't know who was." (Underlining added) Id. 1482.
In the rebuttal portion of his argument, Attorney Morano made the following additional personal comments concerning the credibility of a defense witness:
 "Edgar Leon Perry. Again, as I stated earlier, I believe Mr. Perry's testimony is tainted by extreme loyalty to Mr. Jenkins. . . . I submit to you that Mr. Perry is not bothered by going to jail. He's a very cold and calculated person. Don't look at jail through your eyes. Look at it through his. He may be saying, `Hey, I don't care. I'm in jail now'." Id. 1495-1496.
Attorney Gerace did not object to any of Attorney Morano's comments during closing argument. He did not ask for a curative instruction with respect to any of the statements, and he did not ask for a charge specifically tailored to the State's Attorney's improper statements. While he testified that he had no specific recollection of the argument, he stated his general view that jurors are disturbed and become upset if one lawyer interrupts another during closing argument. He also expressed the general concern that a lawyer who interrupts another lawyer during argument may not only be perceived as rude by the jury, but may be viewed as attempting to hide something from the jury. CT Page 11850
Aside from these general notions, Attorney Gerace articulated no tactical reason for not having objected to any of the improper comments and the court will not assume the presence of any now forgotten tactic which might have motivated counsel's muteness in the face of these several improper comments.
In considering this issue, Attorney Avitabile stated his belief that it is improper for a prosecutor to interject his personal beliefs into final argument. Attorney Avitabile stated that after Attorney Morano had made a few "I statements" counsel should have objected. In this case where the credibility of witnesses was pivotal, the court agrees with Attorney Avitabile that defense counsel should not have remained mute in the face of Attorney Morano's personal comments regarding the credibility of defense witnesses. Additionally, counsel should have asked for an immediate curative instruction with respect to the impropriety of counsel offering an opinion regarding the credibility of a defense witness.
In State v. Williams, 204 Conn. 523 (1987), the Connecticut Supreme Court opined,
 "The prosecutor may not express his own opinion, either directly or indirectly, as to the credibility of witnesses. United States v. Modica, supra; United States v. Drummond, 481 F.2d 62 (2nd Cir. 1973); State v. Floyd, 10 Conn. App. 361, 365, 523 A.2d 1323 (1987); ABA Standards for Criminal Justice (Second), The Prosecution Function 3-5.8 (b) (1985) (hereinafter ABA Standards.) Nor may he express his opinion, directly or indirectly, as to the guilt of the defendant. Harris v. United States, supra, 658; ABA Standards supra. Such expressions of personal opinion are a form of unsworn and unchecked testimony." Id., 541.
ABA Standard 3-5.8, concerning the function of the prosecutor in argument to the jury, states, in part:
 ". . . (b) It is unprofessional conduct for the prosecutor to express his or her personal belief or opinion as to the truth or falsity of any testimony or evidence or the guilt of the defendant." American Bar Association, Standards for Criminal Justice, Standard 3-5.8, (1980). CT Page 11851
The rationale for this admonition is contained in the commentary to the standard. It states,
 "The prosecutor's argument is likely to have significant persuasive force with the jury. Accordingly, the scope of argument must be consistent with the evidence and marked by the fairness that should characterize all of the prosecutor's conduct. Prosecutorial conduct in argument is a matter of special concern because of the possibility that the jury will give special weight to the prosecutor's arguments, not only because of the prestige associated with the prosecutor's office but also because of the fact-finding facilities presumably available to the office." Id.
With respect to the propriety of a prosecutor making statements of personal beliefs in argument, the commentary states,
 "Expressions of personal opinion by the prosecutor are a form of unsworn, unchecked testimony and tend to exploit the influence of the prosecutor's office and undermine the objective detachment that should separate a lawyer from the cause being argued." Id.
In addition to the admonitions of the ABA Standards, such conduct is proscribed by the Rules of Professional Conduct. Rule 3.4, Fairness to Opposing Party and Counsel states:
"A lawyer shall not:
 (e) In trial, allude to any matter that the lawyer does not reasonably believe is relevant or that will not be supported by admissible evidence, assert personal knowledge of facts in issue except when testifying as a witness, or state a personal opinion as to the justness of a cause, the credibility of a witness, the culpability of a civil litigant or the guilt or innocence of an accused." Rule 3.4, Rules of Professional Conduct. (cf. State v. James, 211 Conn. 555 (1989) for CT Page 11852 explicit reference to Rule 3.4 in this context.)
These rules were adopted in Connecticut in 1986 and were binding on counsel at the time of the petitioner's trial.
In State v. Oehman, 212 Conn. 325, 336 (1989), the Supreme Court stated,
 "While the prosecutor is permitted to comment upon the evidence presented at trial and to argue the inferences that the jurors might draw therefrom, he is not permitted to vouch personally for the truth or veracity of the state's witnesses. `The personal evaluations and opinions of trial counsel are at best boring irrelevancies and a distasteful cliche-type argument. At worst, they may be a vague form of unsworn and irrelevant testimony.' Harris v. United States, 402 F.2d 656, 659 (D.C. Cir. 1968)."
Attorney Morano's statements, supra, contained expressions of his belief in the credibility of witnesses.[9] A prosecutor is no more entitled to state his disbelief in a defense witness than he is to state his belief in a state's witness. Both are expressions of personal opinion concerning the credibility of witnesses.
The fact that Attorney Gerace vouched for the credibility of Perry after his truthfulness had been attacked by Attorney Morano does not put the issue into equipoise because the prosecutor and defense counsel do not have mirrored responsibilities. In an article on prosecutorial ethics, Professor Monroe Freedman quoted with approval from a 1959 Joint Conference Report on Professional Responsibility prepared by the American Bar Association and the Association of American Law Schools as follows:
 "The public prosecutor cannot take as a guide for the conduct of his office the standards of an attorney appearing on the behalf of an individual client. The freedom elsewhere wisely granted to partisan advocacy must be severely curtailed if the prosecutor's duties are to be properly discharged." Freedman, "The Professional Responsibility of the Prosecuting Attorney", 55 Georgetown Law Journal 1030, 1042 (1967). CT Page 11853
Consistent with this view, one Supreme Court Justice opined,
 "Of course, when defense counsel employs tactics which would be reversible error if used by a prosecutor, the result may be an unreviewable acquittal. The prosecutor's conduct and utterances, however, are always reviewable on appeal, for he is `both an administrator of justice and an advocate.' ABA Standards for Criminal Justice 3-1.1(b) (2nd ed. 1980); cf. Berger v. United States, 295 U.S. 78, 88 (1935)." United States v. Young, 470 U.S. 1
(1985).
This distinction between the function of the prosecutor and defense counsel has received judicial approbation in Connecticut. In State v. Falcone, 191 Conn. 12, 22 (1983), Justice Shea opined:
 "When reviewing allegations of prosecutorial misconduct, it must be kept in mind that `[a] prosecutor is not an ordinary advocate. His duty is to see that justice is done and to refrain from improper methods calculated to produce prejudice and wrongful decisions by the jury.' . . . While the privilege of counsel in addressing the jury should not be too closely narrowed or unduly hampered, it must never be used as a license to state, or to comment upon, or even to suggest an inference from, facts not in evidence, or to present matters which the jury have no right to consider."
In addition to statements regarding the credibility of witnesses, Attorney Morano made a representation to the jury concerning the processing of police brutality complaints. This information was not otherwise before the jury.
Referring to testimony that the police had used excessive force, resulting in one of the men having two broken teeth and another transported to the hospital, Attorney Morano stated:
 "Believe me, it's my job and I'm very concerned about excessive force used by police officers. If that were to occur, it would be the office of the CT Page 11854 State's Attorney that would have to prosecute it but it has not been shown here to you and it should distract you by again, one of Mr. Gerace's red herrings." Petitioner's Exhibit 1, Trial Transcript 1455.
This statement regarding his concerns about police brutality, and including the comment that such cases would be prosecuted by his office, suggested information not properly before the jury, and intimated a personal view that there was no merit to the testimony that the police had used excessive force. His comments could reasonably be construed as stating that the Office of the State's Attorney had found no merit to any claims of excessive force resulting from this occurrence. As such, this statement amounted to an improper vouching for the police officers that they did not use unreasonable force, and, by implication, that there was no reason, based on fear of violence from the officers, for the petitioner to have refused to exit the apartment.
The issue of excessive police force was not irrelevant to the petitioner's defense. While the petitioner did not advance duress as a defense, throughout the trial, through counsel's cross examination and by the testimony of defense witnesses, the petitioner attempted to portray that he, his former co-defendants, and the little girl involved, were all afraid of the police because of the threat they posed and because they had used force on two of the men who had left the apartment. The defense argued the point, by implication, that any danger to the child or any delay in opening the apartment door was occasioned by the number of armed police in the hallway and the excessive force allegedly used on two of the men who left the apartment before the petitioner, rather than by the behavior of the apartment's inhabitants.
It is improper for a prosecutor to argue facts not in evidence, especially when the prosecutor suggests he or she is arguing based on personal knowledge of the defendant, the case, or crime-fighting. It was improper for Atty. Morano to suggest, from information not in the record, that there was no basis to the claim of excessive police force. Cf. Nidiry, "Restraining Adversarial Excess in Closing Argument" 96 Columbia Law Review 5, (June 1996), and cases cited therein. It is equally improper for a prosecutor to suggest that information exists outside the record that verifies a witness' truthfulness. cf. Gershman,Prosecutorial Misconduct, Clark, Boardman Callahan, 1994, 10.5 CT Page 11855 (a)(2) Extra Record Verification, and cases cited therein.
The reasons for these proscriptions are several. While, at trial, defense counsel has the sole task of seeking acquittal for his client, the prosecutor does not merely have the mirrored responsibility to seek a conviction. As an officer of the State his duty is to seek justice. Additionally, because of the prosecutor's unique relationship to law enforcement and as a result of the resources typically available to the prosecution, statements of opinion or references to facts outside the record have the risk of greater impact on the jury than the same statements might have if made by defense counsel. In Berger v.United States, the court put the proposition clearly. While addressing the proper function of the United States Attorney, the commentary is equally applicable to the State's Attorney:
 "The United States Attorney is the representative not of an ordinary party to a controversy, but of a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all; and whose interest, therefore in a criminal prosecution is not that it shall win a case but that justice shall be done. As such, he is in a peculiar and very definite sense the servant of the law, the twofold aim of which is that guilt shall not escape or innocence suffer. He may prosecute with earnestness and vigor — indeed, he should do so. But, while he may strike hard blows, he is not at liberty to strike foul ones. It is as much his duty to refrain from improper methods calculated to produce a wrongful conviction as it is to use every legitimate means to bring about a just one.
 It is fair to say that the average jury, in a greater or less degree, has confidence that these obligations, which so plainly rest upon the prosecuting attorney, will be faithfully observed. Consequently, improper suggestions, insinuations and, especially, assertions of personal knowledge are apt to carry much weight against the accused when they should properly carry none." Berger v. United States, 295 U.S. 78, 88.
The Supreme Court has more recently articulated its concern CT Page 11856 for the undue influence a prosecutor may have on the jury. Commenting on the likely harm of a prosecutor expressing his belief in the guilt of the accused or the truth or falsity of testimony, the Court stated in United States v. Young,470 U.S. 1, 18 (1985):
 ". . . the prosecutor's opinion carries with it the imprimatur of the Government and may induce the jury to trust the Government's judgment rather than its own view of the evidence."
In United States v. Modica, 663 F.2d 1173, pp. 1178-79, (2nd Cir. 1981) cert. denied, 456 U.S. 989 (1982), the court wrote:
 "The American Bar Association Standards for Criminal Justice declare: `It is unprofessional conduct for the prosecutor to express his or her personal belief or opinion as to the truth or falsity of any testimony or evidence or guilt of the defendant.' ABA Standards for Criminal Justice, Standard 3-5.8 (b) (1980). The policies underlying this proscription go to the heart of a fair trial. The prosecutor is cloaked with the authority of the United States Government; he stands before the jury as the community's representative. His remarks are those, not simply of an advocate, but rather of a federal official duty-bound to see that justice is done. The jury knows that he has prepared and presented the case and that he has complete access to the facts uncovered in the government's investigation. Thus, when the prosecutor conveys to the jurors his personal view that a witness spoke the truth, it may be difficult for them to ignore his views, however biased and baseless they may in fact be."
Reasonably competent criminal defense counsel, acting in the exercise of ordinary diligence, should have been aware of the admonitions of the ABA Standards and the Rules of Professional Conduct. Moreover, counsel at trial in 1989 was charged with knowledge of relevant decisional law, and specifically, the Connecticut Supreme Court admonition in State v. Williams, supra,204 Conn. 541 (1987) that, "The prosecutor may not express his own opinion, either directly or indirectly as to the credibility of witnesses." CT Page 11857
Additionally, while the fact that Attorney Gerace commented directly on the credibility of Perry in his summation may be construed as having invited a responsive argument from Attorney Morano on rebuttal, defense counsel's comments came after all but one of Attorney Morano's statements, as noted supra.
Following counsel's arguments, the court charged the jury. Included in the charge was the standard admonition concerning the obligation of the jury to consider only the testimony and exhibits introduced during the trial, and that counsels' comments during the' trial and closing arguments did not constitute evidence. cf. Petitioner's Exhibit 1, Trial Transcript, 1517.[10]
The court's charge did not include any specific reference to the statements made by the Assistant State's Attorney concerning the petitioner's having a criminal record, his assessment of witness credibility, or his comments regarding excessive police force.
Though the court understands and generally agrees with the notion that counsel should avoid interrupting a lawyer during closing argument, this general persuasion must give way if the argument is improper, pertinent to significant trial issues, and harmful. The court agrees with Attorney Avitabile that once the Assistant State's Attorney had made one or two personal comments about the credibility of defense witnesses, reasonably effective counsel, given the facts of this case, would have sought the court's intervention to stop the improper comments and reasonably effective counsel would have sought a curative instruction to the jury. Finally, reasonably effective counsel would have sought a jury charge specifically geared to the improper statements made by the Assistant State's Attorney.
In assessing the prejudice component of the Strickland
formulation, the court is mindful that the test is one of materiality, and is not outcome determinative. Thus, while the petitioner need not establish that counsel's deficient performance more likely than not altered the outcome of the trial, he must demonstrate a reasonable probability of a different result. Addressing this issue, the Court, inStrickland, opined:
"An ineffective assistance claim asserts the CT Page 11858 absence of one of the crucial assurances that the result of the proceeding is reliable, so finality concerns are somewhat weaker and the appropriate standard of prejudice should be somewhat lower. The result of a proceeding can be rendered unreliable, and hence the proceeding itself unfair, even if the errors of counsel cannot be shown by a preponderance of the evidence to have determined the outcome." Strickland v. Washington, supra, 466 U.S. at 694 (1984). (cf. also, Bunkley v. Commissioner, 222 Conn. 444 (1992, and Andrews v. Commissioner, 45 Conn. App. 2242 (1997) for the adoption in Connecticut of this formulation.)
The Strickland Court continued,
 "Accordingly, the appropriate test for prejudice finds its roots in the test for materiality of exculpatory information not disclosed to the defense by the prosecution, United States v. Agurs, 427 U.S. at 104, 112-113, and in the test for materiality of testimony made unavailable to the defense by Government deportation of a witness, United States v. Valenzuela-Bernal, supra, at 872-874. The defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." Id.
In considering the test for materiality in the context of the Government's failure to disclose exculpatory information, the United States Supreme Court recently stated,
 "The question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence. A `reasonable probability' of a different result is accordingly shown when the Government's evidentiary suppression `undermines confidence in the outcome of the trial.'" (internal citations omitted) Kyles v. Whitley, 514 U.S. 419, CT Page 11859 433 (1995).
Similarly, the Court, in Lockhart v. Fretwell, 506 U.S. 364,368 (1993) stated,
 "Our decisions have emphasized that the Sixth Amendment right to counsel exists `in order to protect the fundamental right to a fair trial.' (Internal citations omitted.) Thus, `the right to the effective assistance of counsel is recognized not for its own sake, but because of the effect it has on the ability of the accused to receive a fair trial. Absent some effect of challenged conduct on the reliability of the trial process, the Sixth Amendment guarantee is generally not implicated.'" (Internal citations omitted.)
Additionally, while in reviewing prejudice the court must assess counsel's deficiencies in the context of the entire trial, specific instances of deficient conduct may implicate one'sSixth Amendment right. As noted by the United States Supreme Court,
 "The type of breakdown in the adversarial process that implicates the Sixth Amendment is not limited to counsel's performance as a whole — specific errors and omissions may be the focus of a claim of ineffective assistance as well." United States v. Cronic, 466 U.S. 648 (1984).
Thus, while counsel's deficiencies must be evaluated in the context of the entire trial for purposes of determining materiality, counsel's excellence in the evidentiary phase of the trial, as in this case, does not, by itself, weigh against the petitioner's claim that counsel's performance was deficient during closing argument. The issue is not whether counsel was deficient throughout the trial, but rather whether his ineffectiveness during closing argument rendered the trial unfair so that its outcome is unreliable.
In assessing prejudice in the context of the entire trial, the court looks to the strength of the State's case as well as the relevance of counsel's deficiencies to issues of significance in the case. In Strickland, the Court opined that when making a determination whether a petitioner has demonstrated a reasonable probability that, but for counsel's errors, the outcome of the CT Page 11860 proceedings would have been different,
 ". . . a court hearing an ineffectiveness claim must consider the totality of the evidence before the judge or jury. Some of the factual findings will have been unaffected by the errors, and factual findings that were affected will have been affected in different ways. Some errors will have had a pervasive effect on the inferences to be drawn from the evidence, altering the entire evidentiary picture, and some will have had an isolated, trivial effect. Moreover, a verdict or conclusion only weakly supported by the record is more likely to have been affected by errors than one with overwhelming record support. Taking the unaffected findings as a given, and taking due account of the effect of the errors on the remaining findings, a court making the prejudice inquiry must ask if the defendant has met the burden on showing that the decision reached would reasonably likely have been different absent the errors." Strickland v. Washington, supra, 466 U.S. at 695 (1984).
The court finds that counsel's failure to object during closing argument to the Assistant State's Attorney's statement that the defendant had a criminal record, to his personal comments on the credibility of defense witnesses, and to his statement concerning the role of his office in prosecuting claims of excessive police force, together with his failure to seek curative instructions and a jury charge specifically geared to the offending remarks render the results of the petitioner's trial unreliable. The court finds that, but for counsel's failures as stated, there is a reasonable probability that the jury would have had a reasonable doubt as to the petitioner's guilt.
In making this assessment, the court notes that while none of the comments made by the Assistant State's Attorney were egregious, the statements were all directed to factors and issues central to the proof of the State's case with the exception of Attorney Morano's misstatement that Jenkins had a felony record.
In this closely contested case, Attorney Gerace assailed the credibility of police witnesses by attempting to demonstrate that CT Page 11861 their testimony was at variance with their written reports, and that, in some cases, it was based not on personal observation but on the reports of others. Several defense witnesses offered testimony contradicting the State's evidence on points crucial to the State's burden of proof. While officers claimed that the petitioner forcibly pulled the child back into the apartment as the women occupants were leaving, defense witnesses asserted that the child clung to the petitioner, that she was more afraid of the police than of the persons remaining inside the apartment, and that she ran back to the petitioner. While police claimed that the petitioner possessed a weapon inside the apartment, defense witnesses stated that the petitioner held no weapon, and one defense witness claimed that he, in fact, possessed the weapon in question. While the State offered evidence that the petitioner held the child up to a rear window and made threatening statements, defense witnesses denied hearing Jenkins make threatening statements or seeing him hold the child to the window in a threatening manner.
While police officers testified that they could hear clearly the petitioner make threatening statements through the apartment's closed metal door, Attorney Spears testified that because he was not able to adequately hear the petitioner through the door, he went around to the rear of the apartment to speak with the petitioner through an open window.
While Attorney Wesley Spears stated that once he arrived at the apartment he told the petitioner that it was safe to leave the apartment, and Attorney Spears testified that the police had used excessive force on men who had left the apartment earlier in the incident, the State, through argument, decried this suggestion that the defendant remained in the apartment because he was afraid of violence from the police as a red herring devised by defense counsel as part of a trial strategy. The Assistant State's Attorney's comments about excessive police force and the role of his office in processing such claims suggesting that no excessive force was used contradicted Attorney Spear's testimony and were relevant to the charge that the petitioner interfered with a search warrant by refusing to allow the police access to the interior of the apartment.
Thus, the State's claims that the petitioner was in possession of a gun, recklessly endangered a child by keeping her in the apartment and by holding her up to a window in a threatening manner, shouted threats to the police, unreasonably CT Page 11862 prevented their access to the apartment, and placed the child in an atmosphere of risk were all contradicted by the defense witnesses whose credibility was the subject of Attorney Morano's personal comments.
It is the court's assessment of this matter, that the strength of the State's case was dependant on the credibility of the testifying police officers and the corresponding lack of credibility of defense witnesses.
In making its assessment that, but for counsel's failures as stated, there is a reasonable probability that the jury would have had a reasonable doubt as to the petitioner's guilt, the court refers not only to the statements characterizing the credibility of witnesses and implying personal knowledge of the merits of any excessive police force claim, but also to counsel's mistaken reference to the petitioner as having a prior felony record. Also, the court assesses these statements collectively in the context of the strength and character of the State's evidence. In that regard, while the jury deliberations lasted less than two hours, the State's evidence was contested by defense counsel's rigorous and probing cross examinations and by presentation of defense witnesses whose testimony contradicted the State's evidence of the petitioner's criminal culpability.[11]
From a review of the trial transcript, it is clear to the court that defense counsel was well prepared for trial and conducted a competent and professional defense throughout the evidentiary phase of the trial. Shortly before the commencement of closing argument, Attorney Gerace and Attorney Morano engaged in a colloquy before the court on the subject of closing argument. During this discussion, Attorney Gerace expressed his concern that Attorney Morano should not be permitted to comment on any alleged difficulty in the possible future prosecution of Perry for the admissions he had made while testifying on the basis that such an argument would be testimonial, and he asked the court to instruct counsel not to engage in such an argument. cf. Petitioner's Exhibit 1, Trial Transcript, 1322. This colloquy demonstrates defense counsel's awareness of the impropriety of testimonial argument, and it provides some indication that counsel had this concern in mind in advance of final argument. It provides no illumination, however, for counsel's subsequent failure to object once Attorney Morano's argument did, in fact, become testimonial. While the court finds that defense counsel's CT Page 11863 examinations and cross examinations reflected high professional zeal and competence, his failure to respond to the improper arguments of the Assistant State's Attorney by objecting and seeking an appropriate instruction was a deficiency in performance, and this deficiency, given the character and relative strength of the evidence for and against the petitioner, was prejudicial. These failures have sufficiently undermined this court's confidence in the verdicts and judgment so as to entitle the petitioner to a new trial.
While the court's determination of the ineffectiveness claim relating to trial counsel disposes of the petition, the court notes, in regard to the claim against appellate counsel, that in order to succeed on direct appeal, unless he could have shown that any of the prosecutor's comments violated a right specifically enumerated in the Bill of Rights, the petitioner would have had to demonstrate that Attorney Morano's improper and unchecked comments to the jury denied him a fair trial in violation of the due process clause of the Fourteenth Amendment of the United States Constitution, or in violation of ArticleFirst, Section 8 of the Connecticut Constitutional provision that "no person shall be . . . deprived of liberty . . . without due process of law . . ." To satisfy the due process burden without implicating a specifically enumerated right, one must normally prove that the comments were so egregious and prejudicial that they rendered the trial unfair. cf. Donnell v. DeChristoforo,416 U.S. 637 (1974, Darden v. Wainwright, 477 U.S. 168, (1986), Statev. Bova, 240 Conn. 210 (1997), State v. Couture, 194 Conn. 530
(1984). As noted by several commentators, this is a difficult burden. cf. Balske, supra, "Prosecutorial Misconduct During Closing Argument: The Arts of Knowing When and How to Object and of voiding the `Invited Response' Doctrine", 37 Mercer Law Review 1033 (1986). When defense counsel fails to object to the improper comments, and to seek appropriate remediation, the burden on appeal is often insurmountable. Addressing this point, Judge Stoughton, speaking for the Appellate Court in State v. Reddick,15 Conn. App. 342, 354 (1988) stated,
 "It is well settled that when a defendant does not object and take exception to allegedly prejudicial remarks of the state's attorney, at the time they are made or at close of argument, the right to press the claimed error is waived; unless the remarks constitute a pattern of blatantly egregious misconduct indicating a deprivation of a CT Page 11864 fair trial."
The fact that the failure to object to improper comments and to seek curative instructions effectively prevents appellate review in all but the most egregious cases heightens counsel's duty to be watchful and protective of the defendant's rights at trial. Commenting on this issue Dennis Balske, stated:
 "Generally speaking, the failure to lodge a contemporaneous objection will waive consideration of the asserted error on review. In the few instances, however, when the error is so blatant that it could not have been cured, a failure to object may not constitute a waiver.
 In order to prevail in a case in which no objection was tendered, defense counsel will eventually have to pass the plain error test. Convincing a Federal court particularly the Supreme Court, that the prosecutor's conduct undermined fundamental fairness and resulted in a miscarriage of justice, is no easy task. Translated, this standard requires defense counsel to establish both that the prosecutor's misconduct was extremely egregious and that the client is innocent.
 The lesson is straightforward: defense counsel cannot sit idly by when the prosecutor utters an improper remark. If he does, he will be taking a chance that a reviewing court either will find the claim of error to have been waived, or will hold defense counsel to a legal test of prejudice that he cannot meet. Instead, when he senses the scent of an impropriety, defense counsel should object, seek a curative instruction, and move for a mistrial (out of the presence of the jury)." Balske, supra, "Prosecutorial Misconduct During Closing Argument", 37 Mercer Law Journal 1061-1062, (1986.)[12]
For the reasons stated, the petition for a new trial is granted. The petitioner is ordered conditionally discharged from the sentences imposed in this case.[13] He shall be discharged from these sentences unless within thirty days of the filing of this Memorandum, the State's Attorney for the Hartford Judicial CT Page 11865 District files a notice in the Hartford J.D. clerk's office, with the petitioner, and with habeas counsel, of his intention to retry the petitioner.
Bishop, J.